# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. HEATH MICHAEL WILLISON, Defendant. | No. CR15-4034-LTS<br><br>**ORDER** |

## I. INTRODUCTION

This case is before me on a motion (Doc. 48) for compassionate release filed by defendant Heath Michael Willison through counsel. The Government has filed a resistance (Doc. 56). Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

On January 19, 2016, United States District Judge Mark W. Bennett sentenced Willison to 120 months' imprisonment after he pleaded guilty to conspiracy to distribute 50 grams or more of actual methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Doc. 37. According to the online Bureau of Prisons (BOP) inmate locator, Willison is currently at Canaan USP in Waymart, Pennsylvania, and his projected release date is January 20, 2024.[1] He is 45 years old. Doc. 34 at 2.

---

[1] As of October 13, 2020, six inmates and five staff members had tested positive for COVID-19 at Canaan USP. *See COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited October 13, 2020).

## III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was recently modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of the BOP. The FSA modified § 3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No. CV18-00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> And that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A).

Willison does not meet the requirements of § 3582(c)(1)(A)(ii). He is under 70 years of age and has not served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c). Thus, his only possible avenue for relief is § 3582(c)(2)(A)(i).

2

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13 (U.S. Sentencing Comm'n 2018); *see also United States v. Hall*, No. CR98-7, 2019 WL 6829951, at *3 (E.D. Ky. Dec. 13, 2019); *United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist in the following circumstances:

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>>
>> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

3

> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. Courts are split on whether the policy statement is binding because it predates the FSA's changes to 18 U.S.C. § 3582(c)(1)(A). A number of district courts have concluded that Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See, e.g.*, *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019); *United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Fox*, No. CR14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019). Other courts have concluded that extraordinary and compelling reasons exist only if they are included in the Guideline. *See, e.g.*, *United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

As I have previously stated, I agree with those courts that have found that although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes. *See United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *see also Rodriguez*, 424 F. Supp. 3d at 682 (Congress knew that the BOP rarely granted compassionate release requests prior to the FSA, and the purpose of the FSA is to increase the number of compassionate release requests granted by allowing defendants to file

4

motions in district courts directly even after the BOP denies their request); *Brown*, 411 F. Supp. 3d at 451 (same).[2]

---

[2] The Eighth Circuit Court of Appeals has declined to expressly overrule the current version of § 1B1.13. But it has indicated that district courts should consider extraordinary and compelling reasons outside the strict confines of § 1B1.13. In a case where the district court denied a defendant's compassionate release motion, the defendant argued the district court erred by relying on the § 1B1.13 policy statements. In declining to consider that issue, the Eighth Circuit noted that district court was clearly aware of the change of the law:

> While some courts adhere to "the pre-First Step Act policy statements," "[o]ther courts [have] ruled that the pre-First Step Act policy statements are inapplicable, and that a judge has discretion to determine, at least until the Sentencing Commission acts, what qualifies as 'extraordinary and compelling reasons.'" *Id*. (citing *United States v. Brown*, 411 F. Supp. 3d 446, 448–51 (S.D. Iowa Oct. 8, 2019)). . .
>
> After analyzing whether Rodd satisfied the "extraordinary and compelling reasons" criteria set forth in § 1B1.13, the district court assumed that Rodd satisfied a more expansive definition of the phrase and analyzed the compassionate-release motion under 18 U.S.C. § 3553(a). Specifically, the court stated, "Even assuming Congress intended to expand the use of compassionate release with the First Step Act, the Section 3553(a) factors present at sentencing have not changed. Rodd does not qualify for compassionate release." *Id*.

*United States v. Rodd*, No. 19-3498, 2020 WL 4006427, at *4–5 (8th Cir. July 16, 2020). The Eighth Circuit went on to find that:

> We need not determine whether the district court erred in adhering to the policy statements in § 1B1.13. The district court knew its discretion. It expressly stated that "[e]ven assuming Congress intended to expand the use of compassionate release with the First Step Act, the Section 3553(a) factors present at sentencing have not changed" and, as a result, "Rodd does not qualify for compassionate release." *Rodd*, 2019 WL 5623973, at *4; *see also id*. ("[E]ven assuming a more expansive definition of 'extraordinary and compelling reasons' under the First Step Act, Rodd's Motion is denied."). In other words, the district court assumed that Rodd's health and family concerns constituted extraordinary and compelling reasons for compassionate release. Therefore, we need only determine "whether the district court abused its discretion in determining that the § 3553(a) factors weigh against granting [Rodd's] immediate release."

*Rodd*, 2020 WL 4006427, at *6. In a footnote, the Eighth Circuit also observed that, "'[a]s the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems

5

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

Willison submitted an administrative request for compassionate release to his warden on July 26, 2020, which was denied. Doc. 48-1; Doc. 53-1. He filed this motion (Doc. 48) through counsel on September 9, 2020. I find he has exhausted his administrative remedies as required by § 3582(c)(1)(A).

### B. *Extraordinary and Compelling Reasons*

Willison argues that the threat the COVID-19 pandemic poses to him, in light of his particular health issues, constitutes extraordinary and compelling reasons. Willison, who is 45 years old, states that he was born with "anencephaly hydrocephalus,"[3] for which he has undergone numerous brain surgeries during his life, most recently in September 2019. Doc. 48 at 2–3. He states he has had his right eye removed and suffers from reduced vision in his left eye. *Id.* at 3. He states he suffers from hypertension and

---

unlikely there will be a policy statement applicable to [compassionate-release] motions brought by defendants in the near future.' *United States v. Beck*, 425 F. Supp. 3d 573, 579 n.7 (M.D.N.C. 2019)." *Id.* at *5 n.7; *see also United States v. Loggins*, No. 19-2689, 2020 WL 4375103, at *2 (8th Cir. July 31, 2020) (where the Eighth Circuit observed that § 1B1.13 does not reflect the current version of the compassionate release statute, but found no error because "[w]here the [district] court expressly considered post-sentencing rehabilitation (a circumstance not listed in § 1B1.13), the more natural inference is that the court did not feel constrained by the circumstances enumerated in the policy statement, but simply found that a non-retroactive change in [sentencing] law did not support a finding of extraordinary or compelling reasons for release."

[3] "Anencephaly" and "hydrocephalus" appear to be two distinct conditions. *Cephalic Disorders*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/cephalic-disorders (last visited Oct. 13, 2020). Anencephaly is a condition in which the top of a fetus' neural tube does not close during pregnancy, leading to missing parts of the brain, skull and scalp. *Id.* Hydrocephalus is a condition in which cerebrospinal fluid accumulates in the brain's ventricles. *Id.* Willison's medical records indicate hydrocephalus is the condition for which he has continued to receive treatment into adulthood. Doc. 48 at 3–4.

numerous pulmonary conditions including acute respiratory failure with hypoxia,[4] pneumonitis,[5] acute respiratory decompensation,[6] chronic obstructive pulmonary disease (COPD)[7] and patchy airspace disease.[8] *Id.* at 4.

Willison further states that he has an intelligence quotient (IQ) of 78, indicating cognitive impairment. *Id.* at 5. He states that this impairment makes it difficult for him to communicate his medical needs to BOP staff. *Id.* Lastly, he states he has a history of mental illness, twice attempting to commit suicide since 2010. *Id.* In addition to Willison's pleadings, his medical records indicate he is hearing-impaired and has reduced mobility, struggling to walk and needing a wheelchair at times. Doc. 56-3 at 1, 3. And while he states he last had surgery in September 2019, records indicate he has undergone surgical procedures in the spring and summer of 2020 related to the shunts placed in his brain for treating hydrocephalus, along with additional hospitalizations for ensuing

---

[4] Acute respiratory failure leads to insufficient oxygen reaching the brain, heart or other parts of the body. *What to know about acute respiratory failure*, Medical News Today, https://www.medicalnewstoday.com/articles/324528 (last visited Oct. 13, 2020). Hypoxia indicates that the individual has low oxygen levels. *Id.*

[5] Pneumonitis refers to inflammation or irritation of the lungs. *What is Pneumonitis?*, WebMD, https://www.webmd.com/lung/what-is-pneumonitis (last visited Oct. 13, 2020).

[6] Decompensation refers to an organ's loss of function. *Decompensation*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/decompensation (last visited Oct. 13, 2020).

[7] COPD refers to a group of conditions causing airflow blockage and problems breathing. *Basics about COPD*, CDC, https://www.cdc.gov/copd/basics-about.html (last visited Oct. 13, 2020).

[8] Patchy airspace disease refers to air-space opacification. Jeremy Jones et al., *Air-space opacification (summary)*, Radiopaedia, https://radiopaedia.org/articles/air-space-opacification-summary-1?lang=us (last visited Oct. 13, 2020). This is a phenomenon in radiology in which lung x-rays reflect pulmonary consolidation, a condition in which material, such as pus, blood or cells, fills the lungs' airways and makes breathing harder. *Id.*; *see also Lung Consolidation: What It Is and How It's Treated*, Healthline, https://www.healthline.com/health/lung-consolidation (last visited Oct. 13, 2020).

7

complications. *Id.* at 1; Doc. 56-6 at 45, 109; Doc. 56-7 at 2; Doc. 56-8 at 10–11; Doc. 56-9 at 40.

The Centers for Disease Control and Prevention (CDC) list categories of people with underlying medical conditions who are or might be at a higher risk of severe illness from COVID-19.[9] COPD is listed as a condition that increases an individual's risk of severe illness from COVID-19, while hypertension is listed as a condition that might increase an individual's risk of severe illness from COVID-19.

The Government acknowledges that the CDC lists COPD as a condition presenting a higher risk for more severe reaction to COVID-19 and hypertension as a condition that might present a higher risk. Doc. 56 at 12. But the Government argues that Willison does not have a severe enough condition appropriate for compassionate release because the BOP provides him adequate treatment. *Id.* at 13. The Government also notes that he offers no release plan other than requesting to live with his mother in Milford, Dickinson County, Iowa, and that Dickinson County has far more cases of COVID-19 than Canaan USP. *Id.* at 16.

After reviewing Willison's submitted medical records, I find no express diagnosis of COPD.[10] Indeed, a January 2020 medical record provides that he has no history of COPD. Doc. 56-6 at 404. I nevertheless appreciate that his records do expressly provide he suffers from numerous pulmonary issues, such as respiratory failure and pneumonitis,

---

[9] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 13, 2020).

[10] COPD refers to a group of diseases that affect air flow, most commonly emphysema and chronic bronchitis. *See Basics about COPD*, CDC, https://www.cdc.gov/copd/basics-about.html (last visited Oct. 13, 2020); *COPD*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 (last visited Oct. 13, 2020). Willison's medical records do not expressly indicate he has COPD, emphysema or chronic bronchitis.

conditions producing the same or similar symptoms as COPD.[11]  *See, e.g.*, Doc. 54-1 at 48.

Regardless of the express diagnosis, there appears to be no dispute that Willison's pulmonary conditions would increase his risk of serious illness if he were infected with COVID-19. While I appreciate the BOP has taken many measures to prevent the transmission of COVID-19 among its inmate population,[12] the virus has nonetheless spread through many BOP facilities.[13] As of October 13, 2020, of the 126,162 inmates in BOP-managed institutions and 14,267 in community-based facilities, 15,589 have tested positive.[14] This corresponds to an infection rate across BOP facilities of 11%. The national infection rate is 2%.[15] As of October 13, 2020, six inmates and five staff

---

[11] *Compare Basics about COPD*, CDC, https://www.cdc.gov/copd/basics-about.html (last visited Oct. 13, 2020) (describing COPD's symptoms as including coughing, shortness of breath and difficulty taking deep breaths) *with Respiratory Failure*, WebMD, https://www.webmd.com/lung/acute-chronic-respiratory-failure (last visited Oct. 5 2020) (describing respiratory failure's symptoms as including shortness of breath and inability to take in enough air) *and What is Pneumonitis?*, WebMD, https://www.webmd.com/lung/what-is-pneumonitis (last visited Oct. 13, 2020) (describing pneumonitis' symptoms as including coughing and difficulty breathing).

[12] According to the BOP's website, those measures have included limiting inmate movement within each facility and between facilities, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Oct. 13, 2020).

[13] Other BOP facilities have experienced COVID-19 outbreaks. For example, as of October 13, 2020, 1305 inmates, or 75% of inmates, have tested positive for COVID-19 at Seagoville FCI, 4 of whom have died. At Terminal Island FCI, 600 inmates, or 71% of inmates, have tested positive, 10 of whom have died. *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Oct. 13, 2020).

[14] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Oct. 13, 2020).

[15] This is based on 7,787,548 COVID-19 cases and a population of 330,442,164. *See COVID Data Tracker*, CDC, https://www.cdc.gov/covid-data-tracker/#cases (last visited Oct. 13,

9

members had tested positive for COVID-19 at Willison's facility.[16] Thus, COVID-19 is present at Canaan USP and Willison is at risk of contracting it.

I also appreciate Willison's overall physical condition appears to be deteriorating. His vision, hearing and mobility are all impaired. Doc. 56-3 at 1, 3. His hydrocephalus appears increasingly serious, necessitating surgical procedures and additional hospitalizations for treating complications in the past year.[17] *Id.* at 1. Episodes of vomiting, gait changes, headaches and dizziness preceded these hospitalizations. *See, e.g.*, Doc. 56-6 at 52, 57, 110. One particularly severe episode comprised Willison being unable to stand, walk, feed himself or access the toilet without assistance for approximately two days. *Id.* at 163. On the other hand, I recognize that he may be aggravating the severity of these symptoms in refusing to take some of his prescribed medications.[18] *See, e.g.*, *id.* at 22, 31. Regardless, I find Willison's deteriorating health and his specific pulmonary conditions, when viewed in the context of the current COVID-19 pandemic, constitute an extraordinary and compelling reason for release.[19] Therefore, I will consider whether the remaining factors support granting Willison's motion.

---

2020); *U.S. and World Population Clock*, United States Census Bureau, https://www.census.gov/popclock/ (last visited Oct. 13, 2020).

[16] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Oct. 13, 2020).

[17] A BOP medical record provides his prognosis is "guarded." Doc. 56-3 at 1. A guarded prognosis is a "prognosis given by a physician when the outcome of a patient's illness is in doubt." *Guarded prognosis*, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/guarded+prognosis (last visited Oct. 13, 2020).

[18] It appears Willison at times refuses his medications to protest the BOP's alleged failure to provide him hearing aids. *See, e.g.*, Doc. 56-6 at 33, 63. A BOP medical record deems him fairly compliant in taking his medications and adhering to recommended treatment. Doc. 56-3 at 1.

[19] Willison's deteriorating health conditions would arguably constitute extraordinary and compelling reasons even absent the COVID-19 pandemic.

10

## C. *Section 3553(a) Factors and Danger to Community*

Guideline § 1B1.13(2) provides that compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Additionally, § 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release. Section 3553(a) requires that I consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]
>
> (5) any pertinent policy statement [issued by the Sentencing Commission . . .']
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Government argues the § 3553(a) factors weigh against a sentence reduction, citing Willison's offense conduct, criminal history and incarceration record. Doc. 56 at 14. The Government also argues granting his motion would engender sentencing

disparities because Judge Bennett sentenced him to the mandatory minimum. *Id.* at 14–15.

Willison's offense conduct is serious. The Government conducted four controlled buys in which Willison sold 5.6 grams of actual methamphetamine. Doc. 34 at 3, ¶ 5. He stipulated to distributing 50 to 150 grams of actual methamphetamine. *Id.* at 4, ¶ 7. While distributing any quantity of methamphetamine is dangerous, I recognize Willison is far from a drug kingpin. As both the Government and Willison's counsel stated during sentencing, he dealt in grams. Doc. 41 at 4, 7. In the context of drug trafficking cases that come before this court, Willison was a run-of-the-mill dealer. However, his offense was more aggravating because it occurred while Willison was on parole for two prior controlled substance offenses. Doc. 34 at 10, ¶¶ 42–43, 46.

Those convictions are only two in Willison's lengthy and sometimes-violent criminal history. He was scored with 17 criminal history points, well above the level necessary to qualify as a criminal history category VI. *Id.* at 11, ¶ 47. His violent offenses include three convictions for domestic abuse assault[20] and a conviction for assault on peace officers and others. *Id.* at 6-7, ¶¶ 28–31. While these offenses are extremely troubling, I note that the most recent occurred in 2001. Since then, almost all of Willison's offenses relate to possessing or distributing controlled substances.[21] *Id.* at 7–11, ¶¶ 32–43. This history led to his classification as a career offender and an advisory sentencing guidelines range of 262 to 327 months in prison. *Id.* at 5, 17 ¶¶ 18, 87.

Willison's prior controlled substance offenses seem to have involved dealing similarly small quantities of controlled substances as he did in the instant offense. *See, e.g., id.* at 10, ¶ 42 (offense involving 5 grams or less of methamphetamine). Judge

---

[20] One of these domestic abuse assaults involved Willison striking his live-in girlfriend in the head and neck repeatedly, causing injuries that required treatment at a hospital. Doc. 34 at 7, ¶ 31.

[21] Willison also has a 2005 conviction (Doc. 34 at 9, ¶ 38) for operating a vehicle while intoxicated and a 2012 conviction (*Id.* at 11, ¶ 43) for unlawful burning.

Bennett characterized Willison as an "extremely low-level drug dealer," and granted a downward variance in part because he determined that the guidelines range produced by the career offender enhancement "substantially overstate[d]" what would be sufficient punishment. Doc. 41 at 11, 12.

There are other mitigating factors, particularly Willison's motive and his impaired cognitive abilities. Regarding his motive, at sentencing the Government acknowledged that Willison explained his dealing as him "lik[ing] to help people out." *Id.* at 7. Willison's mother wrote a letter in which she stated he engages in this conduct because he thinks he is making friends and then these friends take advantage of him. Doc. 33-3 at 3. The Government stated that Willison's mother was "probably correct" in her assessment. Doc. 41 at 7. Judge Bennett concluded Willison derived "very little personal gain" from his dealing. Doc. 41 at 11. However misguided or naive this motive may be, it is less aggravating a motive than when individuals engage in criminal behavior out of greed or other purely selfish reasons. *See, e.g.*, *United States v. Mathison*, No. CR06-4030-LTS, 2020 WL 3263042, at *9 (N.D. Iowa June 17, 2020) (denying motion for compassionate release in part because greed motivated defendant's actions). I also note Willison using methamphetamine and marijuana appears to have contributed to his conduct. Doc. 34 at 15, ¶¶ 75–76. Indeed, at sentencing, the Government stated Willison may have dealt in part to "feed his own habit." Doc. 41 at 7. While his own substance abuse does not excuse his conduct, it does provide context. *See United States v. Campbell*, No. CR03-4020-LTS, 2020 U.S. Dist. LEXIS 136530, at *18 (July 31, 2020) (recognizing defendant's addictions partly drove his criminal behavior in deciding to grant compassionate release).

As for Willison's impaired cognitive capabilities, in 1990 a school psychologist reported that Willison had an IQ of 78, placing him in the "borderline range" of mental disability or "minimal mental disability." Doc. 33-2 at 2. Willison was placed in special education classes throughout school. Doc. 34 at 16, ¶ 78. However, a psychologist who evaluated Willison to determine his competence to stand trial diagnosed him with

13

antisocial personality disorder and malingering, indicating he may exaggerate his limitations at times.[22]  Doc. 19-1 at 11.  How his cognitive functioning impacts his behavior became more concrete at sentencing: The Government stated Willison is "in a niche of people who take advantage of him."  Doc. 41 at 7.  Judge Bennett found him to be "extremely easily manipulated by others to do things including illegal conduct . . . ."  *Id.* at 15.  He concluded that Willison has "limited intellectual functioning."  *Id.* at 11.

As the Supreme Court has stated in the context of death penalty litigation, "impaired intellectual functioning is inherently mitigating."  *Tennard v. Dretke*, 542 U.S. 274, 287 (2004).  While this case is not a death penalty case and Willison may not be as impaired as some of those cases' defendants, the relationship between cognitive capabilities and culpability remains relevant because "the severity of the appropriate punishment necessarily depends on the culpability of the offender."  *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).  When a defendant is cognitively impaired, he or she is less culpable, even if only to a degree.  His or her punishment should reflect this reduced culpability.  *Id.*  As noted above, Judge Bennett did, in fact, consider Willison's intellectual functioning when determining his sentence, taking it into account in granting a downward variance of more than 11 years.

Unfortunately, Willison's disciplinary record in prison is aggravating – especially given his violent past.  He has had four disciplinary infractions: possessing a dangerous weapon (a lock inside a sock), fighting with another inmate, threatening bodily harm (balling his fists and stating, "I'm going to have something done" and "You don't know what I'm capable of") and refusing to obey an order.[23]  Doc. 56-5 at 1–2.  The weapon and fighting infractions are the most serious and the most recent, occurring on January 18, 2018.  *Id.* at 1.  Willison has also, at times, not cooperated with BOP officials

---

[22] The report is qualified in that Willison's limited eyesight prevented the administration of most traditional psychological tests.  Doc. 19-1 at 3.

[23] Regarding the fourth infraction, Willison claims he did not hear the order.  Doc. 56-5 at 2.

14

attempting to administer prescribed medication.[24]  *See, e.g.*, Doc. 56-6 at 22, 31.  While I appreciate that Willison has taken and completed various education courses, Doc. 56-4 at 1, his conduct while incarcerated is concerning.

The Government also argues that because Judge Bennett granted Willison a downward variance to the mandatory minimum sentence, releasing him before he serves that minimum sentence would engender sentencing disparities.  Doc. 56 at 14–15.  In so arguing, the Government emphasizes that Willison has served only approximately 50% of his sentence.  *Id.* at 14.  This argument carries some weight.  I acknowledge that Judge Bennett made it clear that he would have imposed a lesser sentence if the law did not require a sentence of 120 months, stating: "This is a classic case of why mandatory minimums are a very bad idea . . . I would not impose a 120-month sentence which is the mandatory minimum if I didn't have to . . . ."  Doc. 41 at 11.  Nonetheless, Congress exercised its Constitutional authority in determining that a sentence of 120 months is the minimum a court may impose for Willison's offense.  While this does not preclude the grant of compassionate release before a defendant has served at least the statutory minimum sentence,[25] it is a factor to consider – especially when a defendant has served barely half of that amount of time.

Regarding the need to protect the public, I am not convinced that Willison would pose no threat to the public if released.  This is based largely on his recidivist past and disciplinary record in prison.  While his health has deteriorated, he is only 45 years old and is not so severely impaired as to be rendered immobile and incapable of committing additional crimes, as he did on a regular basis before being sentenced in this case.

---

[24] As discussed, it appears Willison at times refuses his medications to protest the BOP's alleged failure to provide him hearing aids.  *See, e.g.*, Doc. 56-6 at 33, 63.  A BOP medical review deems him fairly compliant in taking his medications and adhering to recommended treatment.  Doc. 56-3 at 1.

[25] *See, e.g.*, *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *6–7 (N.D. Iowa Jan. 8, 2020); *United States v. Bess*, No. CR16-156-LJV, 2020 WL 1940809, at *11 n.11 (W.D.N.Y. Apr. 22, 2020) (collecting cases).

Willison's situation is sympathetic. However, he committed a serious federal felony drug offense while already under court supervision for prior offenses and has a lengthy criminal history that caused him to qualify as a career offender and includes numerous acts of violence. He has served only about half of the statutory minimum sentence he received and has had disciplinary issues while incarcerated that raise concerns about his willingness to commit additional acts of violence. Having weighed the § 3553(a) factors, I find that Willison is not eligible for compassionate release.

## V. CONCLUSION

For the foregoing reasons, Willison's motion (Doc. 48) for compassionate release is **denied**.

**IT IS SO ORDERED.**

**DATED** this 16th day of October, 2020.

_____
Leonard T. Strand, Chief Judge